**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MICHAEL L. HOSFELT, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**JASON SANDIDGE, et al.,**<br><br>**Defendants.** | **Case No. 24-CV-02170-SPM** |

# MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Since the Supreme Court issued its decision in *District of Columbia v. Heller*, courts across this nation have recognized that the Second Amendment of the Constitution confers an "individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Nonetheless, the American legal tradition has "long recognized" that this right comes with exceptions, *U.S. v. Rahimi*, 602 U.S. 680, 716 (2024) (Kavanaugh, J., concurring); *see Heller*, 554 U.S. at 595 ("Of course the right [to keep and bear arms] was not unlimited, just as the First Amendment's right of free speech was not"); *Rahimi*, 602 U.S. at 737 (Barrett, J., concurring) ("Despite its unqualified text, the Second Amendment is not absolute. It codified a pre-existing right, and pre-existing limits on that right are part and parcel of it."). The government can disarm certain classes of people, including felons and the mentally ill. *Heller*, 554 U.S. at 626–27 n.26 (stating that prohibitions on the possession of firearms by felons and the mentally ill are "presumptively lawful"); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786

(2010) (plurality opinion) (reiterating *Heller*'s assurances about the lawfulness of "longstanding measures" barring felons and the mentally ill from possessing firearms). It can restrict where people can bear arms: "Sensitive places" like schools and government buildings may be deemed areas where private citizens cannot carry weapons. *Heller*, 554 U.S. at 626–27 (citation modified). And the government can limit the types of arms people can possess. *Id.* at 624, 627 (holding that the Second Amendment only protects the possession of weapons that are not "dangerous and unusual"); *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 408–09 (7th Cir. 2015) (upholding municipal ban on the possession of assault rifles).

On the whole, however, the contours of the Second Amendment are in flux. *Rahimi*, 602 U.S. at 736 (Kavanaugh, J., concurring) (explaining that, compared to First, Fourth, and Sixth Amendment jurisprudence, "Second Amendment jurisprudence is still in the relatively early innings."); Wilson *v. Cook Cnty.*, 937 F.3d 1028, 1036–37 (7th Cir. 2019) (calling the analysis of the Second Amendment an "emerging area of the law"); *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1181, 1189 (7th Cir. 2023); *Moore v. Madigan*, 708 F.3d 901, 905 (7th Cir. 2013) (Hamilton, J., dissenting) (noting that, with respect to the Second Amendment, "the law is genuinely in doubt, as it is likely to remain for some time"); *Rhein v. Coffman*, 825 F.3d 823, 826 (7th Cir. 2016) ("many details about how to implement the Second Amendment need to be worked out"); *Moore*, 703 F.3d at 942 (conceding that the limitations to the right to self-defense conferred by the Second Amendment comprise a "vast *terra incognita*"). What behavior is protected and what isn't, is, in many important cases, far from clear. Before this Court is one such case.

Plaintiffs Michael L. Hosfelt and Ray C. Greer allege that Defendant Zachary Kettlekamp violated their Second Amendment and related due process rights when Kettlekamp followed the procedure outlined in Illinois law to revoke Plaintiffs' Firearm Owner Identification cards. Kettlekamp argues that he did not violate clearly established law and therefore is protected by qualified immunity. The Court agrees. [1]

## FACTUAL BACKGROUND

On July 21, 2024, Madison County Sheriff's Department deputies Defendants Jason Sandidge and Walker DSN 372[2] were dispatched to Plaintiff Michael L. Hosfelt's home in response to an anonymous complaint. (Doc. 72, ¶¶ 6, 9). When the deputies arrived, they found Hosfelt, Plaintiff Ray C. Greer, and fired shotgun shell hulls in the backyard. (*Id.*, ¶¶ 7, 9). Although Hosfelt and Greer were unarmed, the deputies arrested them. (*Id.*, ¶¶ 8, 11). Following the arrests, Sandage completed "Clear and Present Danger" forms with respect to both Hosfelt and Greer, and forwarded the forms to the Illinois State Police. (*Id.*, ¶¶ 72–73).

Illinois State Police Firearms Services Bureau officer Defendant Zachary Kettlekamp reviewed the "Clear and Present Danger" forms, evaluated whether the forms demonstrated by a preponderance of the evidence that Hosfelt and Greer posed clear and present dangers to themselves or others, then revoked their Firearm Owner's Identification ("FOID") cards. (*Id.*, ¶¶ 3, 134–38); *see* 430 ILCS 65/8.1(d).

[1] Because this Court finds that Kettlekamp is protected by qualified immunity, it need not address Kettlekamp's sovereign immunity argument.

[2] The Court refers to Walker as his name was listed in the operative complaint. (*See id.*, ¶ 5).

## Standard of Review

In analyzing a motion to dismiss for failure to state a claim, courts must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When evaluating a complaint's sufficiency, courts "construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the nonmoving party's] favor." *Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016) (citing *Reynold v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010)). A claim is "plausible" in the [Fed. R. Civ. P.] 12(b)(6) context when there is "more than a sheer possibility that [the defendant] acted unlawfully." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015) (quoting *Olson v. Champaign County*, 784 F.3d 1093, 1099 (7th Cir. 2015) (citation modified)). "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).

## Analysis

### I. Qualified Immunity

The doctrine of qualified immunity ensures that "government officials performing discretionary functions are shielded from liability for civil damages" when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Formigoni*, 42 F.3d 1060, 1064 (7th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Its purpose is to protect society from bearing the social costs that inevitably follow from

government officials being the subject of civil litigation: expenses, lost time, "and the deterrence of able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To overcome a qualified immunity defense, a plaintiff must show that (1) the alleged conduct sets out a violation of a statutory or constitutional right, and (2) the right was clearly established at the time of its alleged violation. *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).[3] Whether a right was "clearly established" "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Too abstract and courts risk transforming the rule of qualified immunity "into a rule of virtually unqualified liability." *Id.*; *see Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Brousseau v. Haugen* 543 U.S. 194, 198 (2004) (per curiam)) (courts must construe the relevant constitutional right "in light of the specific context of the case, not as a broad general proposition"); *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *al-Kidd*, 563 U.S. at 2074) ("'[w]e have repeatedly told courts . . . not to define clearly established law at a high level of generality,' since doing so avoids the crucial question whether

[3] In the past, courts were required to evaluate these requirements sequentially, *Saucier v. Katz*, 533 U.S. 194, 201 (2001), but the Supreme Court has since clarified that courts are free to address each issue in the order that they see fit, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

the official acted reasonably in the particular circumstances that he or she faced" (citation modified)). Too particular and courts might make it near-impossible for members of the public to vindicate violations of their constitutionally guaranteed rights. *See Lopez v. Sheriff of Cook Cnty.*, 993 F.3d 981, 987 (7th Cir. 2021) (citing *Weinmann v. McClone*, 787 F.3d 444, 447–48 (7th Cir. 2015)). To balance these "dueling interests," *id.*, the Supreme Court has furnished a set of standards for judges to use when evaluating a defendant's qualified immunity claim: the constitutional or statutory right must be "specific to the relevant factual context," *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004)), and that right must be clearly established in a "particularized" sense, *Anderson*, 483 U.S. at 640. A right is clearly established when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 563 U.S. at 741. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citation omitted). Usually, to show that a constitutional or statutory right was "clearly established" at the time of its alleged violation, plaintiffs "must point to a 'closely analogous case' finding the alleged violation unlawful." *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (quoting *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)). But in some cases, if the alleged violation is so egregious that any reasonable government official would have believed it to be unlawful, then plaintiffs

are not required to present the court with a closely analogous case to survive a qualified immunity defense. *Id.*

**II. Qualified Immunity at the Motion to Dismiss Stage**

A qualified immunity defense is typically presented at summary judgment because the defense's validity is often a fact-intensive consideration. *Beathard v. Lyons*, 129 F.4th 1027, 1035–36 (7th Cir. 2025) (holding that it is especially inappropriate to address a qualified immunity defense before summary judgment when "the merits of a plaintiff's claim turn on the application of a fact-intensive balancing test"); *Sabo*, 128 F.4th at 843 n.2 (citing *Reed*, 906 F.3d at 548) ("When a qualified immunity defense 'closely depends' on factual determinations, dismissal under Rule 12(b)(6) is inappropriate"); *Pearson v. Callahan*, 555 U.S. 223, 238–39 (2009) (citing *Lyons v. City of Xenia*, 417 F.3d 565, 582 (6th Cir. 2005) (Sutton, J., concurring)) ("When qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify"). The questions that courts must ask to evaluate a qualified immunity defense—did plaintiffs allege a violation of a constitutional or statutory right and was that right clearly established at the time of its alleged violation—are ones that usually can be resolved only by a careful reading of a thoroughly-developed factual record.

Determining whether a qualified immunity defense is available before summary judgment is "a delicate matter." *Jacobs*, 215 F.3d at 765 n.3. There are no hard and fast rules that dictate when doing so is appropriate. *Beathard*, 620 F. Supp. 3d at 784. On one hand, because qualified immunity is a defense from suit rather than just liability, Courts should address it "at the earliest possible stage of a

litigation." *Anderson*, 483 U.S. at 646 n.6; *see Purtell*, 527 F.3d at 621 ("Qualified immunity 'ordinarily should be decided by the court long before trial,' . . . 'because "[t]he entitlement is an immunity from suit rather than a mere defense to liability"'") (citation omitted); *Geo Grp., Inc. v. Menocal*, 607 U.S. 438, 446 (2026) ("immunity ensures that the defendant need not "answer for his conduct" in court at all—that he avoids, in addition to liability, all the usual 'burdens of litigation,' including a trial"). Resolving a case by finding that a defendant is entitled to qualified immunity may happen as early as on a motion to dismiss. *Jacobs*, 215 F.3d at 765 n.3; *see Stevens v. Umsted*, 131 F.3d 697, 706–07 (7th Cir. 1997) (holding that because "the right of an individual to be free from abuse while institutionalized" is not a "clearly established" constitutional right, the lower court's decision to shield defendant from section 1983 liability on account of his qualified immunity at the motion to dismiss stage was correct). Furthermore, "it is plaintiffs' burden to show," or plead in the FED. R. CIV. P. 12(b)(6) context, that the constitutional right that has alleged violated was clearly established at the time of its alleged violation. *Landstrom v. Illinois Dep't of Child. & Fam. Servs.*, 892 F.2d 670, 675 (7th Cir. 1990). On the other hand, plaintiffs are not required to anticipate a qualified immunity defense in their pleadings, *Jacobs*, 215 F.3d at 765 n.3, so the factual record at the motion to dismiss stage may not be developed enough for a qualified immunity analysis. *Alvarado v. Litscher*, 267 F.3d 648, 651–52 (7th Cir. 2001) (citing *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring)); *see Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022) (quoting *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020) ("Our cases

make clear that the motion-to-dismiss stage is *rarely* 'the most suitable procedural setting to determine whether an official is qualifiedly immune.'" (citation modified)).

But there are situations where courts have all the information they need to address a qualified immunity defense at the motion to dismiss stage. *See Landstrom v. Illinois Dep't of Child. & Fam. Servs.*, 699 F. Supp. 1270, 1275 n.12 (N.D. Ill. 1988), aff'd, 892 F.2d 670 (7th Cir. 1990). One of these situations is "when the relevant issues are legal or 'abstract.'" *Beathard*, 129 F.4th at 1035. An issue is "abstract" when it concerns "the substance and clarity of pre-existing law." *Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011)). In those cases, although "the plaintiff may have stated a claim, it is not one 'upon which relief can be granted,'" making dismissal under Rule 12(b)(6) permissible. *Jacobs*, 215 F.3d at 765 n.3; *see Landstrom v. Illinois Dep't of Child. & Fam. Servs.*, 892 F.2d 670, 675 n.8 (7th Cir. 1990) (qualified immunity appropriately granted at motion to dismiss stage where "plaintiffs' initial pleadings themselves, taken as true, fail to adequately allege the violation of any clearly established right").

## III. Second Amendment Precedent at the Time of the Incident

For most of this nation's history, the meaning of the Second Amendment was considered "well settled" among the courts. *Heller*, 554 U.S. at 626. Most judges agreed that it did not confer a right to keep and bear arms for "purely private activities." *Rahimi*, 602 U.S. at 743 (Jackson, J., concurring) (quoting *Heller*, 554 U.S. at 676 (Stevens, J., dissenting)). But that orthodoxy was replaced with a new one when the Supreme Court issued its decision in *Heller*. No longer was the Second Amendment right to keep and bear arms confined to their use in "certain military"

activities, *Heller*, 554 U.S. at 638 (Stevens, J., dissenting), but it was now understood to confer an "individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592. The Court recognized that a "central component" of the Second Amendment right to bear arms was the right to self-defense. *New York State Rifle & Pistol Association, Inc., v. Bruen*, 597 U.S. 1, 29 (quoting *McDonald*, 561 U.S. at 767). Consequently, the District of Columbia's handgun ban—which would have left Americans without "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family"—failed to stand up to "constitutional muster." *Heller*, 554 U.S. at 628–29 (quoting *Parker v. D.C.*, 478 F.3d 370, 400 (D.C. Cir. 2007), aff'd sub nom. *D.C. v. Heller*, 554 U.S. 570 (2008)).

As discussed *supra*, the right to keep and bear arms, like most constitutional rights, has its limitations. To assess whether a limitation is Constitutional, judges must assess whether it is "consistent with this Nation's historical tradition" of firearm regulation. *Bruen*, 597 U.S. at 17; *McDonald*, 561 U.S. at 768 (citing *Heller*, 554 U.S. at 592–94). In *Bruen*, the Court sought to make *Heller*'s text-and-history test "more explicit." *Bruen*, 597 U.S. at 31; *see id.* at 79 (Kavanaugh, J., concurring) (noting that, in *Bruen*, the Court "employ[ed] and elaborate[d] on the text, history, and tradition test that *Heller* and *McDonald* require" (citation modified)). The Court clarified: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"

*Bruen*, 597 U.S. at 24 (quoting *Konigsberg*, 366 U.S. at 50 n.10). Determining whether a regulation comports with this "Nation's historical tradition of firearm regulation" requires courts to seek out historical analogues to the regulations that are under scrutiny. That analytic requirement "is neither a regulatory straightjacket nor a regulatory blank check." *Id.* at 24, 30. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30.

The Court's first post-*Bruen* application of the text-and-history standard came down a month before Kettlekamp revoked Plaintiffs' FOID cards. In *U.S. v. Rahimi*, the Court held that "[w]hen a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect." 602 U.S. at 690. The Court noted that the Government had "offer[ed] ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Id.* at 693.

While conducting its historical analysis, the Court clarified the nature of the analogical reasoning lower courts ought to apply when situating a regulation within America's "tradition of firearm regulation." *Id.* at 691, 700; *see id.* at 714 (Gorsuch, J., concurring) (observing that the "central message" of the Court's holding in *Rahimi* was a consequence of "following exactly the path [it] described in *Bruen*"); *id.* at 736 (Kavanaugh, J., concurring) (stating that the Court's opinion in *Rahimi* "carefully buil[t] on *Heller*, *McDonald*, and *Bruen*"). Even "when a challenged regulation does

not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29–30) (citation modified). That "law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29–30) (citation modified).

By the time Kettlekamp revoked Plaintiffs' FOID cards, some contours of the Second Amendment were clearly established. Ordinary citizens have a right to possess firearms in and outside of their homes, *Heller*, 554 U.S. at 629; *McDonald*, 561 U.S. at 749–50, and a government entity may not condition receiving a firearm license on showing "proper cause." *Bruen*, 597 U.S. at 71. The Court had also outlined some encroachments on the right to bear arms that are lawful or presumptively lawful: "dangerous and unusual" weapons may be made unavailable to ordinary citizens, *Heller*, 554 U.S. at 627, felons and the mentally ill may be disarmed, *id.* at 626–27, as could those who were found to pose a credible threat to the physical safety of an intimate partner, *Rahimi*, 602 U.S. at 701–02, and firearms could be banned from being carried in "sensitive places," *Heller*, 554 U.S. at 626–27.[4] Most contours of the Second Amendment, however, remain in flux.

[4] Prior to *Bruen*, the Seventh Circuit had decided many Second Amendment cases under the means-end legal standard rejected in *Bruen*. The Seventh Circuit had held that a government may disarm perpetrators of domestic violence, *U.S. v. Skoein*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), unlawful users of controlled substances, *U.S. v. Yancey*, 621 F.3d 681, 682–83 (7th Cir. 2010), felons, *U.S. v. Williams*, 616 F.3d 685, 692–94 (7th Cir. 2010), *Baer v. Lynch*, 636 F. App'x 695, 696–98 (7th Cir. 2016), *U.S. v. Shields*, 789 F.3d 733, 750 (7th Cir. 2015), the mentally ill, *Culp v. Raoul*, 921 F.3d 646, 654 (7th Cir. 2019), and illegal aliens, *Meza-Rodriguez*, 798 F.3d at 672–73. The Seventh Circuit had also held that governments may ban "dangerous and unusual" weapons, *Friedman*, 784 F.3d at 408–09; *Bevis*, 85 F.4th at 1182, 1187, and condition the issuance of a firearms license on parental consent if the license applicant is between the ages of 18 and 20, *Horsley v. Trame*, 808 F.3d 1126, 1127, 1131 (7th Cir. 2015). This precedent does not inform whether Kettlekamp's actions fell within the purview of the Second Amendment.

**IV. Application to This Case**

The nature of the history and tradition test makes government officials' actions in the course of their routine duties related to firearm regulation and confiscation well-protected by qualified immunity. A government official following legally proscribed procedures for taking away a person's right to possess firearms is ill-suited to assess whether the procedures are "constant with this nation's history and traditions," a complicated question for scholars, so until the courts establish that particular types of laws are inconsistent with the Second Amendment, government officials are protected by qualified immunity when following procedures for taking away the right to possess firearms. *See Anderson*, 483 U.S. at 640 (right is "clearly established" only if it is "particularized"). Although the Court cannot say on this record whether Kettlekamp infringed on Plaintiffs' Second Amendment rights, Kettlekamp did not violate any clearly established Second Amendment protections.

Plaintiffs allege that Kettlekamp violated their Second Amendment rights by revoking their FOID cards without a hearing after finding based on a preponderance of the evidence that they presented a clear and present danger to themselves or others. (Docs. 72, 94). This was and is the procedure outlined under Illinois law, *see* 430 ILCS 65/8.1, and there is no clearly established law identifying this procedure, or any similar procedure, as unconstitutional.

Under Illinois law, a person presents a "[c]lear and present danger" if that person:

> (1) communicates a serious threat of physical violence against a reasonably identifiable victim or poses a clear and imminent risk of serious physical injury to himself, herself, or another person as determined by a physician, clinical

> psychologist, advanced practice psychiatric nurse, or qualified examiner; or (2) demonstrates threatening physical or verbal behavior, such as violent, suicidal, or assaultive threats, actions, or other behavior, as determined by a physician, clinical psychologist, advanced practice psychiatric nurse, qualified examiner, school administrator, or law enforcement official.

430 ILCS 65/1.1. Illinois revokes FOID cards after finding by a preponderance of the evidence that a person presents a clear and present danger and does not permit card holders to participate in that initial determination. 430 ILCS 65/8.1. The card holder does, however, have the right to both administrative and judicial review of the decision. 430 ILCS 65/10; 430 ILCS 65/11.

What process is constitutionally required before revoking a FOID card remains unclear, but the existing law suggests that the Illinois process is constitutional. Prior to *Bruen* and *Rahimi*, the Seventh Circuit held that it was constitutional for Illinois to refuse to issue a concealed carry firearm license based on a preponderance of the evidence that a person was not qualified to hold the license. *Berron v. Illinois Concealed Carry Licensing Rev. Bd.*, 825 F.3d 843, 848 (7th Cir. 2016) ("Section 66/20(g) uses a preponderance standard, which is the norm in civil litigation. . . . We do not see why the Second Amendment would alter that standard" (citations omitted)). Regardless of whether this remains good law, it is certainly not clearly established that the state may not use a preponderance of the evidence standard to determine whether someone remains eligible to hold a FOID card.

As to whether Kettlekamp could find that Plaintiffs presented a danger significant enough to revoke their FOID cards, the standard outlined in the Illinois statutes differ from the standards approved of in *Rahimi*. This does not make the standard unconstitutional, however. The Court in *Rahimi* identified one law that was

constitutional; it did not establish and rule of law that would make other laws unconstitutional. *Rahimi*, 602 U.S. at 702 (quoting *Bruen*, 597 U.S. at 31) ("In *Heller*, *McDonald*, and *Bruen*, this Court did not 'undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment.' Nor do we do so today. . . . Rather, we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment.") (citation omitted). It therefore cannot be a basis on which to find that Kettlekamp violated clearly established law.

As to Plaintiffs' argument that they were entitled to a hearing with notice before their FOID cards were revoked, rather than as part of the process to undo a revocation, this is similarly unestablished by clearly established law. Plaintiffs cite to three cases that discuss due process generally, *see Bell v. Burson*, 402 U.S. 535, 542 (1971) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)) (driver's license suspension); *U.S. v. Cozier*, 777 F.2d 1376, 1383–84 (9th Cir. 1985) (forfeiture); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542–43 (1985) (public employee for cause termination), but none of the cases are particularized to this context, so they do not create clearly established law here.

Because there is no clearly established law establishing that Kettlekamp violated Plaintiffs' Second Amendment or due process rights, Kettlekamp is entitled to qualified immunity.

## CONCLUSION

Kettlekamp's Motion to Dismiss is **GRANTED**. Counts VII and VIII of the Third Amended Complaint are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

**DATED: October 1, 2026**

**STEPHEN P. McGLYNN**
**U.S. District Judge**